**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| C3, INC. d/b/a C3 IoT | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -against- | ) | C.A. No. _____ |
| | ) | |
| ERIC BLATTMAN, individually, as an assignee | ) | |
| of certain former members of E2.0 LLC, and as | ) | |
| the Securityholder Representative for | ) | |
| Unitholders of E2.0 LLC, LAMB FAMILY | ) | |
| LLC, and DAVID STAUDINGER, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff C3, Inc. d/b/a C3 IoT, by and through undersigned counsel, as and for their complaint, allege:

## PARTIES

1.      C3, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in California, and a successor to C3, LLC ("C3 Energy").

2.      Upon information and belief, Eric Blattman ("Blattman"), an individual who resides in the State of Connecticut, until on or about May 1, 2012, held approximately a 30 percent ownership interest in Efficiency 2.0, LLC ("E2.0").  Together with Blattman, there were 30 Unitholders who collectively owned all of the issued and outstanding membership interests ("Units") of E2.0.  Since at least November 2013, Blattman has held himself out as the Securityholder Representative for E2.0 Unitholders, or has claimed and is claiming to act in that capacity.

1

3.       Upon information and belief, Lamb Family LLC is a limited liability company organized under the laws of the State of Illinois which held until on or about May 1, 2012 approximately a 0.5% percent ownership interest in E2.0.

4.       Upon information and belief, David Staudinger, an individual who resides in the State of New York, held until on or about May 1, 2012 approximately a 1% percent ownership interest in E2.0.

## JURISDICTION AND VENUE

5.       This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 over the claims in this action arising under 15 U.S.C. § 78j(b) and 17 C.F.R. § 240. 10b-5. This Court also has diversity subject matter jurisdiction to hear the state law claims in this action pursuant to 28 U.S.C. § 1332 because these claims arise from a dispute among citizens of different states and the amount in controversy exceeds $75,000 exclusive of costs and interest. Alternatively, this Court has supplemental jurisdiction to hear the state law claims pursuant to 28 U.S.C. §1367.

6.       This Court has personal jurisdiction over the Defendants based upon their consent in the form of a Merger Agreement.

7.       Venue is proper pursuant to a forum selection clause in a Merger Agreement that governs disputes between the parties and provides for legal proceedings exclusively in the courts of Delaware.

## NATURE OF THE ACTION

8.       Through one or more assigned representatives, Blattman and Defendants and/or their predecessors in interest engaged in negotiations with C3 Energy and C3 Energy's management in anticipation of a Merger Agreement entered into on or about April 30, 2012.

Through and as a result of the Merger Agreement, C3 Energy acquired E2.0 and provided shares of C3 Energy to Defendants or their predecessors in interest as consideration for the merger.

9.      In the course of negotiations and in the Merger Agreement itself, Blattman and representatives of E2.0, acting with and on behalf of Defendants or their predecessors in interest, made representations and omissions concerning E2.0 and the state of its business and business assets that were false and misleading in material respects, and, upon information and belief, were knowingly false and misleading when made and made with the intention to deceive C3 Energy and C3 Energy's management.

10.     C3 Energy and C3 Energy's management reasonably and justifiably relied upon such representations in agreeing to the contemplated merger and, as a result, suffered millions of dollars in damages.

## FACTS APPLICABLE TO ALL COUNTS

### History of the Merger

11.     Plaintiff C3 Energy was and is engaged in developing and selling software products in the energy efficiency market.

12.     Upon information and belief, Defendants are former owners or unit-holders of E2.0, a company engaged in the development, licensing, and support of software applications for the energy efficiency market.

13.     The energy efficiency market can be described in terms of three separate sub-markets, each representing a different segment of energy consumers who may use software to monitor and manage their energy use and related services provided by utility companies. These sub-markets, each of which has unique software needs that distinguish it from the others,

include the residential market (*e.g.*, homeowners and renters), the small and medium business ("SMB") market, and the large commercial and industrial market.

14.     In early 2012, representatives of C3 Energy and E2.0 initiated negotiations regarding a potential merger of the two companies. The parties entered into a Mutual Non-Disclosure Agreement on March 1, 2012 regarding any possible transaction and thereafter engaged in meetings and conversations about the merger.

15.     The negotiations culminated in the execution of the Merger Agreement, dated April 30, 2012.  By the terms of the Merger Agreement, E2.0 would be merged with a wholly owned subsidiary of C3 Energy, with C3 Energy as the sole owner of the newly merged entity.

### E2.0 Management's Pattern and Practice of Fraud

16.     In the course of negotiations leading up to the merger and in the Merger Agreement itself, E2.0 management, including Blattman and representatives of Defendants or their predecessors in interest, made material misrepresentations and omissions about E2.0's ability or potential ability to serve certain of these markets, including the residential and SMB markets.  C3 Energy and C3 Energy's management relied on these misrepresentations and omissions in agreeing to the merger and in providing shares of C3 Energy as consideration for the merger.

17.     Upon information and belief, Blattman's and E2.0 management's false and fraudulent representations and omissions about E2.0's ability and potential ability to serve these markets were knowingly false when made and were the result of a pattern and practice of fraud engaged in by Blattman and E2.0 management and its representatives in concert and in

conspiracy with each other, which included conduct in violation of state and federal law, both before and after the merger closed.

18.     <u>First</u>, in negotiations leading up to the merger, E2.0 management, including Blattman and representatives of Defendants or their predecessors in interest, falsely inflated the amount of energy savings associated with E2.0's residential software product. E2.0's value and attractiveness as a merger candidate depended in large part on the amount of energy savings associated with this product.

19.     In February 2012, E2.0 representatives gave a Power Point presentation to C3 Energy management in which they represented that E2.0's residential software product "demonstrated 6% independently verified energy savings."  At subsequent meetings in E2.0's New York offices on March 5, 27, 29, 30, and in C3 Energy's San Mateo offices on March 12, 13, and 16, and on April 17 and 18, E2.0 representatives repeated similar representations, stating that their residential software product could deliver energy savings of 5.91%.  Upon information and belief, this information was false and knowingly misleading.

20.     C3 Energy and C3 Energy's management were not aware that these representations were false at the time they were made but subsequently discovered that they were false and that E2.0 management made similar false representations to E2.0 utility customers, to an independent third-party evaluation firm knowing that they would be provided to a state government regulatory agency, and to prospective customers.

21.     The falsity of E2.0's representations is revealed, for example, in this recorded, electronic exchange between two E2.0 employees in July 2012 concerning representations made before the merger closed:

> **Employee 1**: well, you also recall that [E2.0 management] held my feet to the fire a while back and had me send only data on our 50% most engaged users, correct?

5

**Employee 2**: oh?  that's what their analysis used?

**Employee 1**: yup.  because of the low savings numbers, i was told to find a way to send more positive data

**Employee 2**: hmm, I don't recall reading that part in the report

**Employee 1**: or begin my transition out of the company.  of course you didn't read it, ODC doesn't know

**Employee 2**: erm…that seems rather dubious

**Employee 1**: it doesn't seem dubious.  it IS dubious

**Employee 2**: lovely

**Employee 1**: but i wanted to keep my job

22.     Blattman and E2.0 management arrived at E2.0's purported energy savings of 5.91% or more by deliberately eliminating energy results that did not appear favorable and including in the energy savings calculation only a skewed and limited portion of the available data, representing the experience of only the "most engaged users."  (The reference to ODC in the above-quoted exchange is a reference to Opinion Dynamics Corporation, a third-party consultant hired by the Massachusetts Energy Efficiency Advisory Council & Behavioral Research Team to evaluate the use of E2.0's product by the Western Massachusetts Electric Company.)  To the extent that Blattman and E2.0 were competing to win business in the market by providing false and misleading data to potential customers, including utility companies, their conduct was contrary to representations in section 2.9(k) of the Merger Agreement that E2.0 had not engaged in "unfair competition."  E2.0's purported energy savings was the product of disingenuous data manipulation.

23.     Second, during merger negotiations, E2.0 management, including Blattman and representatives of Defendants or their predecessors in interest, deliberately deceived C3 Energy and C3 Energy's management about the acceptance rate of E2.0's software product in the residential energy efficiency market.  E2.0's acceptance rate was an important

metric:  it indicated the extent to which E2.0's prospective residential users were willing to use or engage with E2.0's software product.  Accordingly, it was fundamental to E2.0's value and attractiveness as a merger candidate.  E2.0's acceptance rate was determined by calculating, among other things, the total number of residential end-users who actually logged onto and enrolled in E2.0's energy portal and then opened energy management accounts.

24.     In a Power Point presentation provided to C3 Energy management in February 2012, E2.0 management represented that its customers had a "25%+ conversion to online engagement."  Blattman and E2.0 management repeated this representation to C3 Management at the same meetings in New York and San Mateo described in paragraph 13 above.

25.     Upon information and belief, E2.0's representations about its acceptance rate in the residential energy efficiency market were not only knowingly false when made, but were the product of a fraudulent scheme that E2.0 employees referred to among themselves as "Meatclouding."

26.     According to the admissions of former E2.0 employees, and as reflected in numerous documents later discovered by C3 Energy management, including a document entitled "Meatcloud Instructions," E2.0 employees unlawfully misappropriated the identities of numerous residential end-users and then surreptitiously activated accounts in their names, thereby falsely inflating E2.0's reported acceptance rate.  E2.0 had access to names and other identification information of residential end-users through its customer relationships with utility companies that served the end users, but E2.0's utility company customers never authorized E2.0 to use such personal information for this illicit purpose and, upon information and belief, contractually prohibited it.

27.     In section 2.9(g)(ii) of the Merger Agreement, E2.0 represented and warranted that "No employee of [E2.0] is . . . in breach of any Contract with any former employer or other Person concerning Intellectual Property Rights or confidentiality due to his activities as an employee of [E2.0]."  Contrary to this representation, E2.0's unauthorized use of personal identification information violated the confidentiality rights of residential end users and, upon information and belief, was also in breach of E2.0's agreements and understandings with its utility company customers.  Moreover, to the extent that E2.0 presented a knowingly false acceptance rate in competing for business, it was engaged in unfair competition contrary to its representations in section 2.9(k) of the Merger Agreement.

28.     Third, in negotiations leading up to the merger, Blattman, E2.0 management and E2.0 representatives falsely represented that E2.0 had a software product capable of serving the SMB market.

29.     In February 2012, E2.0 management presented 21 Power Point slides that purported to describe E2.0's SMB software.  According to the presentation, E2.0's software "covers all major SMB types."  At meetings in E2.0's New York offices on March 5, 27, 29, 30 and in C3 Energy's San Mateo offices on March 12, 13, and 16, and on April 17 and 18, Blattman and E2.0 management made similar representations and discussed in detail the specific function of their SMB software representing that E2.0 had an existing, functional product available for commercial use that met the requirements of the SMB market.  Upon information and belief, E2.0 management made the same or similar representations to their existing and prospective customers, including Southern California Edison.

30.     C3 Energy management subsequently learned that, in fact, E2.0 did not have a functional SMB software product that met the needs of the market and that E2.0's representations were false.

31.     To the extent that E2.0 made false representations about having a functional SMB product to Southern California Edison and other utility companies in competing for business, it was engaged in unfair competition contrary to E2.0's representations in section 2.9(k) of the Merger Agreement.

32.     Blattman's and E2.0's pattern and practice of fraud was designed to inflate the value of E2.0 and was part and parcel of other, more general misrepresentations and omissions Blattman and E2.0 representatives made, including misrepresentations and omissions concerning the value of E2.0's sales pipeline, the quality of E2.0's software, and the adequacy of E2.0's source code.

## E2.0's Fictitious Business Pipeline

33.     During merger negotiations and in the Merger Agreement itself, Blattman and E2.0 management represented E2.0 as having a very strong sales pipeline.  Blattman and E2.0 management represented that E2.0's pipeline and future prospects remained strong throughout the period leading up to the closing of the Merger Agreement.  Following the merger, C3 Energy management discovered that E2.0's business pipeline was and had been quite meager, and had either significantly diminished prior to the merger closing or had been falsely represented from the outset.

34.     During merger negotiations, in a Power Point presentation to C3 Energy management in February 2012, Blattman and E2.0 represented that E2.0 had a business pipeline worth tens of millions of dollars in value.  Specifically, the Power Point represented that:

a)      "In 2011, we secured $10M+ in revenue under contract"

b)      "We have RFPs out for decision in Q1 that represent ~$20M in deal value to be recognized over 2012/13"

c)      "we have a near term pipeline of anticipated RFPs or strategic sales that represent an additional ~$70M in deal value to be recognized over 2012/13"

35.     The Power Point presentation also included revenue projections of $14.7 million for 2013; $26.2 million for 2014; $54.3 million for 2015; and $100.1 million for 2016.

36.     At a meeting on March 12 in San Mateo, Defendant Blattman and E2.0 management met with C3 Energy management in a session called "E2.0 Financial Overview." The agenda for that day's meeting states that the participants would discuss "key financial assumptions," "pipeline review (new business)," and "pipeline review (existing business backlog/upsell)."  Blattman, among others, attended that meeting, at which he and the members of E2.0's management team expressed enthusiasm about the reliability of E2.0's sales pipeline. At other meetings in E2.0's New York offices on March 5, 27, 29, 30 and in C3 Energy's San Mateo offices on March 12, 13, and 16 and April 17 and 18, E2.0 management made similar statements about the revenue prospects from E2.0 sales, reinforcing their claims about E2.0's business pipeline.

37.     In Section 2.5 of the Merger Agreement, E2.0 represented and warranted as follows:  "Since the Interim Balance Sheet Date [Feb 29, 2012]:  (a) there has not been any adverse change in, and no event has occurred that could reasonably be expected to have, an adverse effect on, the Business, condition, assets, liabilities, operations, prospects, net income or financial performance of [E2.0]."

10

38.     Contrary to these representations, E2.0 either never had a strong business pipeline or there had been adverse changes in E2.0's business pipeline before the Merger Agreement closed.   Blattman and representatives of E2.0 fraudulently concealed the real condition and value of E2.0's sales pipeline from C3 Energy and C3 Energy management.

39.     Despite reports of a large and reliable sales pipeline, the vast majority of the deals E2.0 projected did not materialize.

### E2.0's Defective Software

40.     During merger negotiations and in the Merger Agreement itself, Blattman and E2.0 management falsely represented to C3 Energy and C3 Energy management that E2.0 had developed a software product that was bug-free and not deficient in any material respect. After the closing of the Merger Agreement, C3 Energy and C3 Energy management discovered that E2.0's software product was riddled with defects, and that these defects affected E2.0's ability to provide service to customers.

41.     The quality of E2.0's proprietary software products was at the heart of its business and touted as one of its major assets.   Indeed, in a February 2012 Power Point presentation, Blattman and E2.0 management described E2.0 as "a software-as-a-service company supporting the regulated utilities industry."

42.     In Section 2.9(l) of the Merger Agreement, E2.0 represented and warranted as follows:  "None of the software (including all executable version of such software and any firmware or other software embedded in hardware devices) that is or ever has been owned, developed (or currently being developed), owned by or licensed to any Acquired Company and used, marketed, distributed, licensed or sold by any Acquired Company in connection with the Business . . . (collectively, the "Company Software"):  (i) contains any bug,

defect or error . . . that materially and adversely affects the use, functionality or performance of such Company Software or any Company Product or Service or system containing or used in conjunction with such Company Software; or (ii), fails to comply, or would cause any Acquired Company to fail to comply, in any material respect with any applicable warranty or other contractual commitment relating to the use, functionality or performance of such Company Software or any Company Product, Service or System containing or used in conjunction with such Company Software."

43.     Contrary to these representations, E2.0's software product contained defects that materially and adversely affected its use, functionality and performance.  Such defects had been fraudulently concealed from C3 Energy and C3 Energy management and, following the Merger Agreement, caused E2.0 to fail to comply with contractual commitments with its pre-merger customers.  Upon information and belief, the bugs and other defects in the software reduced the energy savings E2.0 could provide below the levels it had contractually promised some of its customers.

44.     For example, E2.0's software could not support such basic features for energy utility companies as multiple meters, re-bills and gas—features that were required under several contracts with E2.0 customers.  Moreover, E2.0's software platform did not perform adequately and took days to load amounts of data that should have been loaded in minutes or hours.

45.     Over 200 defects in E2.0's software were eventually identified by C3 Energy, and an additional 54 defects were eventually identified by one of E2.0's customers in connection with the implementation of the software.

46.     As a result of the bugs and defects and other similar problems associated with E2.0's software, it was necessary for C3 Energy to abandon E2.0 software assets and engineering efforts and then expend considerable time and many millions of dollars to redesign, redevelop, code, quality assure, and then re-release products in a manner in which they were serviceable to customers.

### E2.0's Poorly Constructed Source Code

47.     During merger negotiations and in the Merger Agreement itself, Blattman and representatives of E2.0 falsely represented to C3 Energy and C3 Energy management that E2.0 had developed a Source Code underlying its software product that was consistent with best practices in the industry.  Subsequent to the closing of the Merger Agreement, C3 Energy and C3 Energy management discovered that E2.0's Source Code was poorly constructed and well beneath industry standards.

48.     In Section 2.9(n) of the Merger Agreement, E2.0 represented and warranted as follows:  "The Company Source Code contains annotations and programmers comments and has been documented in a professional manner that is both:  (i) consistent with customary code annotation conventions and best practices in the software as a service industry; and (ii) reasonably sufficient to enable a programmer of reasonable skill and competence to understand, analyze and interpret program logic, correct errors and improve, enhance, modify and support the Company Software in a manner consistent with the Company's past practices."

49.     Contrary to these representations, the E2.0 Source Code did not contain appropriate annotations and comments and was not documented in a professional manner consistent with customary code annotation conventions and best practices in the software-as-a-

service industry.  Upon information and belief, Blattman and representatives of E2.0 fraudulently concealed this information from C3 Energy and C3 Energy management.

50.   C3 Energy software engineers discovered after the merger that the Source Code was so poorly documented in some areas that it was difficult, if not impossible, to understand what the code was intended to do.  They also discovered that the E2.0 software features in the Source Code were hacked together in such a sloppy, unacceptable and unprofessional manner that C3 Energy was required to re-write the code base in order for it to be consistent with customary conventions and acceptable business practices.

### Appointment of E2.0 Securityholder Representative

51.   E2.0 Unitholders initially appointed Thomas Scaramellino as the E2.0 Securityholder Representative, which Section 7.1(a) of the Merger Agreement describes "as the agent and true and lawful attorney-in-fact of the Unitholders, with full power of substitution to act in the name, place and stead of the Unitholders for purposes of executing any documents and taking any actions that the Securityholder Representative may, in its sole discretion, determine to be necessary, desirable or appropriate in all matters relating to or arising out of this Agreement."

52.   Section 7.1(b) of the Merger Agreement grants Indemnitees of the Merger Agreement the right to "deal exclusively with the Securityholder Representative on all matters relating to Sections 1.2, 1.4, 4.6 and 6" and the right to "rely conclusively (without further evidence of any kind whatsoever) on any document executed or purported to be executed on behalf of any Unitholders by the Securityholder Representative and on any other action taken or purported to be taken on behalf of any Unitholder by the Securityholder Representative, as fully binding upon such Unitholder."  Sections 1.2, 1.4 and 6 of the Merger Agreement concern closing payment, post-closing payment, and indemnification.

53.     Section 7.1(d) of the Merger Agreement permits E2.0 Unitholders to appoint a new E2.0 Securityholder Representative if the current E2.0 Securityholder Representative finds himself unable to fulfill his responsibilities as agent of the Unitholders, a majority of E2.0 Unitholders appoint a successor, and C3 Energy is notified of the identity of such successor.

54.     On or about November 4, 2013, Scaramellino sent a letter to C3 Energy informing the company that he had stepped down as E2.0 Securityholder Representative, and that a majority of E2.0 Unitholders had appointed Eric Blattman as his successor.

55.     Blattman was appointed E2.0 Securityholder Representative at some time in 2012 or 2013, or was acting in that capacity.

56.     On or about November 4, 2013, Blattman sent a letter to C3 Energy concerning notices he was providing to C3 Energy "[o]n behalf of myself and all Securityholders."

57.     Blattman sent the letter to C3 Energy on or about November 4, 2013 in his capacity as the new E2.0 Securityholder Representative.

58.     Blattman has never notified C3 Energy or C3 Energy management of his resignation as E2.0 Securityholder Representative, nor has he ever notified C3 Energy or C3 Energy management of the appointment of any successor to the role of E2.0 Securityholder Representative.

59.     Upon information and belief, Eric Blattman is currently the E2.0 Securityholder Representative or acting in that capacity.

**Notice of Fraud and Breaches to Representatives of E2.0**

60.     On or about August 26, 2013, C3 Energy informed Blattman that the company had discovered and was investigating potential fraudulent conduct related to E2.0's meatclouding practices and claimed energy savings.

61.     On or about September 19, 2013, C3 Energy completed the first independent audit of its financial records.

62.     On or about October 4, 2013, C3 Energy sent a Notice of Indemnification Claim to Scaramellino, identifying various inaccuracies in or breaches of representations and warranties contained in sections 2.5, 2.9(l), and 2.9(n) of the Merger Agreement.

63.     The Notice of Indemnification Claim informed Scaramellino that C3 Energy's preliminary estimate of the aggregate dollar amount of damages resulting from the breaches and inaccuracies of representations and warranties contained in sections 2.5, 2.9(l), and 2.9(n) of the Merger Agreement was approximately $4.45 million.

64.     Blattman received a copy of the Notice of Indemnification Claim sent by C3 Energy on or about October 4, 2013.

65.     Blattman responded to C3 Energy's Notice of Indemnification Claim on or about November 4, 2013, and stated "[o]n behalf of myself and all Securityholders … that the allegations of inaccuracies in and breaches of the representations and warranties in the Merger Agreement are denied in their entirety."

**COUNT I: Intentional Fraudulent Misrepresentations and Omissions**

66.     Plaintiff realleges the allegations set forth in paragraphs 1 through 65 as if fully set forth herein.

67.    During the course of merger negotiations and in the Merger Agreement itself, Defendants or their predecessors in interest made the material misrepresentations, and concealed the material information, set forth above.

68.    Such misrepresentations were knowingly false at the time they were made, and the information Defendants failed to disclose and concealed was material and knowingly misleading.

69.    Defendants or their predecessors in interest made the misrepresentations and omissions described above with the intent to defraud and mislead Plaintiff and others at C3 Energy by inducing them to agree to a merger in which C3 Energy provided shares of its stock to Defendants or their predecessors in interest.

70.    Plaintiff and others at C3 Energy believed the truth of the representations described above, were not aware that those representations were untrue, and were not aware of the truth regarding the omitted information described above.

71.    Plaintiff reasonably relied upon said misrepresentations and omissions, and as a direct and proximate result of Defendants' or their predecessors in interests' misrepresentations and omissions, Plaintiff provided Defendants or their predecessors in interest shares of C3 Energy stock.

72.    As a consequence of Defendants' misconduct, Plaintiff has been damaged in an amount to be determined at trial, but not less than $20 million.

73.    Blattman and Defendants' conduct and fraud, or that of their predecessors in interest, was of such a nature as to evince a high degree of moral turpitude and wanton dishonesty as to imply a criminal indifference to civil obligations.

74.     As a consequence of the foregoing outrageous and wanton misconduct, Plaintiff is entitled to the return of, or the disgorgement of, all profits or benefits Defendants or their predecessors in interest had derived or enjoyed as a result of the Merger Agreement.

**COUNT II: Violations of Section 10(b) and Rule 10b5 thereunder of the Exchange Act [15 U.S.C. § 78j(b); 17 C.F.R. § 240. 10b-5]**

75.     Plaintiff realleges the allegations set forth in paragraphs 1 through 65 as if fully set forth herein.

76.     Defendants or their predecessors in interest, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, or of the mails, with scienter, in connection with the purchase of securities (shares of C3 Energy) and the sale of securities (E2.0 units) (a) have employed manipulative and deceptive devises, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business which operated as a fraud and deceit upon Plaintiff.

77.     These devices, schemes and artifices, untrue statements and omissions of material facts, practices, and course of business are set forth in the body of the Complaint.

78.     Defendants or their predecessors in interest acted knowingly with respect to the activities alleged herein.  The representations set forth above were fraudulent and known to be untrue at the time made by Defendants or their predecessors in interest.  The omitted information set forth above was knowingly concealed from Plaintiff.  Defendants or their predecessors in interest made those statements, and concealed that information, to mislead the Plaintiff and other C3 Energy Shareholders and induce them to surrender their shares of C3 Energy in exchange for units of E2.0.

79.     Plaintiff and other C3 Energy Shareholders believed the misrepresentations, and were unaware of the omitted information set forth above, and justifiably relied upon those misrepresentations and omissions in agreeing to surrender their shares of C3 Energy in exchange for units of E2.0.

80.     By reason of the foregoing, Defendants or their predecessors in interest have violated Section 10(b) of the Exchange Act and Rule 10b-5.

81.     As a result of fraudulent acts committed by Defendants or their predecessors in interest, Plaintiff and the other C3 Energy Shareholders have been damaged in an amount to be determined at trial.

## COUNT III: Breach of Contract

82.     Plaintiff realleges the allegations set forth in paragraphs 1 through 65 as if fully set forth herein.

83.     Plaintiff is a counterparty, signatory, and real party in interest to the Merger Agreement described above that was entered into by and among C3 Energy, E2.0 and E2.0's Securityholder Representative.  The Merger Agreement was a valid contract, duly executed and legally binding on the parties.

84.     Blattman and Defendants or their predecessors in interest are the real parties in interest on the E2.0 side of the Merger Agreement.

85.     Plaintiff performed all of the obligations required of it under the Merger Agreement.

86.     Blattman and Defendants or their predecessors in interest failed to perform and breached the Merger Agreement in that they failed to provide a strong sales pipeline, a quality software product and a professional source code, and in that they engaged in unfair competition and violated confidentiality rights contrary to their representations and warranties in

the Merger Agreement, including but not limited to Sections 2.5 and 2.9.    Blattman and Defendants have wrongfully refused to indemnify Plaintiff for such breaches.

87.    Plaintiff suffered damages as a direct and proximate result of Defendants' breaches of contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff C3 Energy respectfully requests judgment in its favor and against Defendants as follows:

a)    With respect to the First Claim, an order awarding C3 Energy its damages for intentional fraudulent misrepresentations and omissions.

b)    With respect to the Second Claim, an order awarding C3 Energy its damages for intentional fraudulent misrepresentations and omissions.

c)    With respect to the Third Claim, an order awarding C3 Energy its damages for breach of contract.

d)    Such further and other relief as the Court may deem to be just and proper.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Kenneth J. Nachbar*
Kenneth J. Nachbar (#2067)
Lauren K. Neal (#5940)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
knachbar@mnat.com
lneal@mnat.com
   *Attorneys for C3, Inc. d/b/a C3 IoT*

OF COUNSEL:

Michael B. Carlinsky
Joseph Milowic III
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000
michaelcarlinsky@quinnemanuel.com
josephmilowic@quinnemanuel.com

Kevin P.B. Johnson
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
(650) 801-5000
kevinjohnson@quinnemanuel.com

August 25, 2016